USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/5/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
UNITED STATES OF AMERICA,

-against-

CHEALIQUE CURRY,

Defendant.

------------------------------------------------------------ X

**OPINION AND ORDER DENYING MOTION TO SUPPRESS**

19 Cr. 742 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

Defendant Chealique Curry is charged with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Officers collected a gun, magazine, and bullet when they searched the home of Carla Jones, where Curry was staying. After the search, Curry admitted to possessing the gun. Curry moves to suppress the items seized from the home, along with his subsequent statement to police. I held oral argument on Defendant's motion on January 23, 2020, and an evidentiary hearing on February 25, 2020. Defendant's motion to suppress is denied.

## RELEVANT FACTS

On July 11, 2019, the New York Department of Corrections issued a warrant for Curry's arrest for alleged violation of the conditions of release. Compl. ¶ 3(a); *see also* Gov't Ex.[1] 2 (certified copy of arrest warrant). The warrant was issued because Curry had failed to report to his parole officer, changed his address without authorization, failed to report to his sex offender or drug treatment programs, and tested positive for cocaine. Tr.[2] 11:5-10, 11:20-23.

---

[1] "Gov't Ex." refers to an exhibit to the Memorandum of Law of the United States of America in Opposition to Defendant Chealique Curry's Motion to Suppress, ECF No. 18.
[2] "Tr." refers to the transcript of the evidentiary hearing held on February 25, 2020.

After the warrant issued, authorities' next task was to find Curry. Curry's parole officer, Officer Yendry Bonilla, performed a delinquency search at the two last known addresses she had for Curry: his cousin's home and a homeless shelter. Tr. 11:11-19. Officer Bonilla did not find Curry at either location. *Id.* By this point, she knew that weeks had passed since Curry had last stayed at his cousin's home or the homeless shelter. Tr. 4:12-5:18, 7:7-13. Officer Bonilla transferred Curry's case to the Warrant Squad. Tr. 11:24-12:9, 19:11-20.

Detective Emerson Charles of the Warrant Squad performed an online investigation to try to locate Curry. Multiple sources associated Curry with an apartment on East 145th Street in the Bronx. TLO, a public database that pulls information about a person's address from other sources, indicated that Curry resided at the East 145th Street address. Tr. 23:10-19, 23:25-24:16. The New York Human Resources Administration ("HRA") database indicated that Curry was receiving public benefits at the same address. Tr. 23:20-24, 24:18-25:7. The Department of Motor Vehicles ("DMV") database showed that Curry's Class D license, expiring June 5, 2021, listed the East 145th Street apartment as his address. Tr. 26:24-28:22. Finally, prison visitor logs from Curry's past incarceration indicated that Jones visited Curry and that she lived at the East 145th Street apartment. Tr. 31:18-24.

Jones testified that she has lived at the East 145th Street apartment with her teenage autistic son for five years, that Curry sometimes stays at her apartment, and that Jones shares her bed with Curry when he stays. Curry Decl.[3] ¶ 2; Jones Decl.[4] ¶¶ 4, 6; Tr. 46:22-24, 47:19-20, 80:13-19. Jones also allows Curry to store some of his personal belongings at her apartment and to use her apartment as his mailing address. Jones Decl. ¶ 6; Tr. 51:14-19, 52:9-21.

---

[3] "Curry Decl." refers to the Declaration of Chealique Curry, ECF No. 14, which was submitted in support of Defendant's motion.
[4] "Jones Decl." refers to the Declaration of Carla Jones, ECF No. 15, which was submitted in support of Defendant's motion.

On July 24, 2019, New York Police Department officers went to Jones's home to execute the warrant for Curry's arrest. Compl. ¶ 3(b); Tr. 97:23-98:5. At approximately 6:30 a.m., officers knocked on the door and announced themselves. Compl. ¶ 3(b)(i); Jones Decl. ¶ 4; Tr. 98:13-99:17. Jones refused entry, even after the officers informed her that they had a warrant for Curry's arrest. Compl. ¶ 3(b)(ii); Tr. 99:11-19. Officers heard her speaking to someone inside. Tr. 99:22-23. The officers then removed the peephole from Jones's door, looked inside the apartment, and observed Jones and her son. Compl. ¶ 3(b)(iii); Tr. 99:24-100:5. Detective Greg Desideri testified that officers removed the peephole before entering for safety reasons, to look inside the apartment. Tr. 100:13-102:2. They saw Jones walking to and from a rear bedroom. Compl. ¶ 3(b)(iii).

Approximately forty minutes after their arrival, the officers informed Jones that they were going to break down the door. Compl. ¶ 3(b)(iv); Tr. 102:20-23. Jones continued to refuse entry and brought her son near the doorway. Compl. ¶ 3(b)(iv)-(v); Tr. 86:17-87:7, 102:24-103:15. When the child stepped away, officers forcefully breached the door, entered, and arrested Curry and Jones. Compl. ¶ 3(b)(vi)-(vii), 3(c); Tr. 103:17-105:6. When Detective Desideri asked Jones whether there was anything in the apartment that should not be there, she told them there were drugs in a cabinet. Compl. ¶ 3(c)(ii); Tr. 107:6-14. Detective Desideri opened the cabinet and saw drugs.[5] Compl. ¶ 3(c)(iii); Tr. 69:15-23; 107:17-19.

At the police station, officers questioned Jones after she waived her *Miranda* rights and while her son was in another room of the station. Compl. ¶ 3(d); Tr. 72:7-10, 73:18-24, 109:23-110:11. Officers asked Jones for her consent to search the apartment. Compl. ¶ 3(d)(i)-(ii); Tr. 111:14-24. They told her that they would take her cooperation into consideration if she consented. Compl. ¶ 3(d)(ii); Jones Decl. ¶ 10; Tr. 74:2-4, 111:25-112:10. After

---

[5] The record is unclear as to whether drugs or drug paraphernalia was observed. Compl. ¶ 3(c)(ii); Tr. 107:6-14, 121:23-123:10, 142:14-18.

3

considering it for twenty to twenty-five minutes, Jones signed a consent to allow officers to search her apartment. Compl. 3(d)(ii), Tr. 74:5-20; *see also* Gov't Ex. 3 (signed consent form).

While searching the apartment after Jones's consent, officers found a gun inside a shoebox in a bedroom closet. Compl. ¶ 3(e), Tr. 115:23-25. Officers also found a magazine, bullet, and knives. Tr. 115:20-116:14. Curry waived his *Miranda* rights and admitted to possession of the gun. Compl. ¶ 4(a)-(b).

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Officers did not obtain a search warrant for Jones's home. The Government argues that the initial entry into Jones's home was justified by the arrest warrant for Curry, and the subsequent search that revealed the gun was permissible because of Jones's consent. Defendant argues that officers did not have a justification for the initial entry into Jones's home; that Jones's subsequent consent to search is invalid because it was obtained through duress and coercion and because it was tainted by the prior constitutional violation; and that Curry's statement is tainted by the prior unconstitutional acts.

**I.** **Initial Entry into Jones's Home Did Not Violate Curry's Fourth Amendment Rights**

Because officers had a valid warrant for Curry's arrest, along with reason to believe that he resided and was present at Jones's apartment, his Fourth Amendment rights were not violated when officers entered Jones's home without a search warrant. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the

4

limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 602-03 (1980); *see also United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) ("Agents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present.").[6] "Reason to believe" is a less stringent standard than probable cause. *Lauter*, 57 F.3d at 215. "[T]he constitutional requirement is that [officers] have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist." *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999); *see also United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) ("We have rejected the contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence.").

Here, Curry does not contest that officers had a valid arrest warrant. I find that officers also had reason to believe that Curry lived at the apartment and was present when they arrived to arrest him. Numerous databases gave East 145th Street as Curry's address. As indicated by the DMV database, he had an active driver's license registered to that address. As indicated by the HRA database, he had most recently received his benefits at that address. As indicated by prison visitor logs, Carla Jones, who lived at that address, visited him in prison. Furthermore, officers knew Curry was not living at the alternative addresses he had given to his parole officer. Officers arrived at approximately 6:30 a.m., a time when someone who lived at the apartment would likely be home. While they waited outside, they heard speaking and

---

[6] The parties devoted substantial portions of their briefing and argument to *United States v. Bohannon*, 824 F.3d 242 (2d Cir. 2016), which concerns the rights of an arrest warrant subject who is apprehended while a guest in another's home, and *Steagald v. United States*, 451 U.S. 204 (1981), which concerns the rights of the homeowner who is temporarily hosting the arrest warrant subject. However, all of the officers' evidence of Curry's whereabouts suggested that he lived at the East 145th Street apartment, not that he was merely a guest there. Thus, *Payton*, rather than *Bohannon* and *Steagald*, controls. *Payton* requires only reason to believe that the subject resides at the home. *See United States v. Lovelock*, 170 F.3d 339, 343-44 (2d Cir. 1999) (finding officers' reasonable belief regarding subject's residence need not be correct).

5

movement, indicating that Jones was not the only person home. While Defendant has suggested that officers should have conducted a more exhaustive investigation, such as by reviewing surveillance footage or cell site data, such certainty is not what the law requires.

## II. Jones Gave Voluntary Consent to the Search That Revealed the Gun

"A warrantless search . . . is constitutional if conducted pursuant to the valid consent of a person in control of the premises. The government has the burden of proving consent voluntarily given by a preponderance of the evidence." *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (internal citations omitted). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (internal citations omitted). Jones was a resident of the apartment and permitted Curry to stay with her. Jones had, at the very least, common authority over the room where Curry stayed, and thus authority to consent to the search. *See United States v. Venizelos*, 495 F. Supp. 1277, 1284-85 (S.D.N.Y. 1980).

Curry argues that Jones's consent was not voluntary because she was under arrest at the time officers sought consent, she was concerned that officers would take her son away, officers misled her about their authority to enter and search the apartment, and because of the cumulative effect of officers' conduct. All of these arguments fail. The fact that Jones was under arrest at the time she gave consent does not render her consent involuntary. *See United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) ("We have repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness."). Defendant cites two cases in which courts found that consent of an individual in custody was not voluntary, but in those cases, the custodial status was one of many factors indicating consent was not freely given. *See United States v. Lewis*, 274 F. Supp. 184, 188 (S.D.N.Y. 1967) (consent was "at best equivocal" where defendant was under arrest and surrounded by four officers, police had already taken defendant's key, defendant denied presence

6

of contraband, and defendant led officers in the opposite direction from his apartment); *United States v. Gregory*, 204 F. Supp. 884, 884-85 (S.D.N.Y. 1962) (noting factual dispute about whether defendant ever gave permission to search and finding that officers' version of events "is not in accord with common experience").[7]

Nor does Jones's fear about the status of her son render her consent involuntary. Jones's son was in another room while Jones was being questioned. While a threat that she could lose custody of her son might render her consent involuntary, *see United States v. Santos*, 340 F. Supp. 2d 527, 538-39 (D.N.J. 2004), Jones does not assert that the officers ever made such a threat or mistreated her son. *See United States v. Sylla*, No. 08–CR–906, 2010 WL 582575, at *9 (E.D.N.Y. Feb. 16, 2010) (finding that defendant's consent to search was voluntary where defendant's daughter was in another room with an agent, as there was no "evidence that the agents treated [defendant]'s family in such a way as to taint his consent").

Contrary to Defendant's argument, officers did not violate Jones's Fourth Amendment rights when they initially entered her home without a search warrant, and they did not mislead her about their authority to enter. They would have violated her Fourth Amendment rights if they only had reason to believe that Defendant was a visitor. *See United States v.*

---

[7] Some courts have held that a defendant lacks standing to object to the voluntariness of another person's consent. *See United States v. Bechdel*, No. 87 CR 618, 1988 WL 2501, at *3 (E.D.N.Y. Jan. 11, 1988) ("Any claim by Lopez based on Tovar's allegedly involuntary or improper consent to search . . . must fail as Lopez lacks standing to object to violations of Tovar's fourth amendment rights."). However, whether Curry was a resident or an overnight guest, he had a legitimate expectation of privacy in Jones's home. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990); *Bumper v. North Carolina*, 391 U.S. 543, 548 n.11 (1968). "[W]hen the Government seeks to intrude upon an individual's legitimate expectations of privacy, it must either obtain a warrant from a neutral magistrate or bring its search within one of the few 'jealously and carefully drawn' exceptions to the warrant requirement." *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). Where the Government argues that the third-party consent exception applies, "the Government must show, by a preponderance of the evidence, that the consent to search was freely and voluntarily given." *Id.* A court in this district, ruling on a houseguest's motion to suppress, found that a third-party homeowner's consent was invalid because the homeowner's consent was tainted by the unlawful entry into her home. *See United States v. Lavan*, 10 F. Supp. 2d 377, 384-86 (S.D.N.Y. 1998). Since I find that the officers' entry was lawful, *Lavan* is distinguishable, but it nonetheless supports that Curry has standing to make his argument. In summary, Curry has standing to object to the voluntariness of Jones's consent, but his challenge fails on the merits.

7

*Bohannon*, 824 F.3d 242, 249-50 (2d Cir. 2016) (noting that warrantless entry into third party's home to carry out arrest warrant for visitor would violate third-party homeowner's Fourth Amendment rights, even if it did not violate arrestee's). But that was not their belief. As discussed above, they had reason to believe that Curry actually lived in the apartment. Where officers enter a home without a search warrant to carry out an arrest warrant on a resident, or someone they have reason to believe is a resident, they do not violate the other co-residents' Fourth Amendment rights. *See United States v. Lovelock*, 170 F.3d 339, 345 (2d Cir. 1999) (holding that officers did not violate a resident's Fourth Amendment protections where they entered his apartment in search of a different individual who they reasonably believed lived there and who was the subject of an arrest warrant); *cf. United States v. Litteral*, 910 F.2d 547, 553 (9th Cir. 1990) ("[U]nder *Steagald*, if the suspect is just a guest of the third party, then the police must obtain a search warrant for the third party's dwelling in order to use evidence found against the third party. But if the suspect is a co-resident of the third party, then *Steagald* does not apply, and *Payton* allows both arrest of the subject of the arrest warrant and use of evidence found against the third party." (internal citations omitted)). Jones assumed this risk when she allowed Curry to stay with her and use her address. *Lovelock*, 170 F.3d at 345 ("A person who occupies premises jointly with another has a reduced expectation of privacy since he assumes the risk that his house-mate may engage in conduct that authorizes entry into the premises.").

In support of Defendant's argument that the "cumulative effect" of officers' conduct was calculated to wear down Jones's resistance, Defendant highlights that officers arrived at 6:30 a.m., when Jones was asleep. A knock on the door at 6:30 a.m. is distinct from the "pre-dawn" raid that occurred at 4:00 a.m. in *Cotzojay v. Holder*. *See* 725 F.3d 172, 174, 183 (2d Cir. 2013). Furthermore, despite the early hour, Jones showed that she had the wherewithal to give or refuse consent when she resisted the officers' entrance into her home for forty minutes, and again when she contemplated the consent form for twenty to twenty-five minutes. Thus, the

8

hour of officers' initial arrival is not a significant factor in evaluating the voluntariness of Jones's consent. *See United States v. Amry*, No. 02 CR. 612, 2003 WL 124678, at *4 (S.D.N.Y. Jan. 16, 2003) (finding defendant gave voluntary consent to search because "[w]hile an early morning arrest in a home would be a shocking and difficult experience for almost anyone, according to [defendant]'s own description of the events, once he was taken into custody he and his family were treated appropriately").

Because Jones gave voluntary consent to the search of the apartment, the items seized will not be suppressed. Furthermore, because these items were found lawfully, there is no basis to suppress Curry's subsequent statement about possession of the gun.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is denied. The Clerk is directed to close the open motion (ECF No. 13).

SO ORDERED.

Dated: March 5, 2020
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

9